UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| CRYSTAL COGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO.: 2:11-CV-77 |
| ) | |
| REGIONAL ELITE AIRLINE SERVICES, LLC, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINON AND ORDER

Regional Elite Airline Services, LLC ("defendant" or "Regional Elite") have filed a Motion for Summary Judgment, [Doc. 33]. First, the defendant argues in the motion that Crystal Coger ("plaintiff" or "Coger") cannot establish a prima facie case of unlawful discharge based on union animus in violation of the Railway Labor Act ("RLA"). *See* 45 U.S.C. § 151 *et seq*. (2011). Second, using the burden shifting framework of the *Wright Line* test, the defendant argues that it would have terminated the plaintiff's employment regardless of any conduct she engaged in that may have been protected by the RLA. The plaintiff has filed a response, [Doc. 39]. She argues that she has established a prima facie case and further argues that the *Wright Line* test does not apply in RLA cases. The matter is ripe for disposition. For the reasons that follow, this Court finds that, considering the facts in the light most favorable to the plaintiff as it must, she survives summary judgment on the elements of a prima facie case. This Court will, however, utilize the *Wright Line* test, and in so doing, this Court finds that there is no genuine issue of material fact as to whether the defendant would have terminated the plaintiff regardless of any RLA protected activity because she undisputedly violated the defendant's no-fault

attendance policy. As such, the defendant's motion is GRANTED, [Doc. 33], and the case is dismissed on the merits.

I. FACTS

The facts considered in the light most favorable to the plaintiff are as follows. Mesaba Airlines, later acquired by the Regional Elite, hired Coger as a customer service/ramp agent ("agent") at its Tri-Cities Airport station ("TRI") in Blountville, Tennessee in 2009. Coger Dep. 95-96. Regional Elite has 25-30 employees. Coger Dep. 111. Coger originally reported to TRI Station Manager Danny Tatum, but in early 2010, Lisa Senters became the new Station Manager at TRI. Coger Dep. 108-09. Regional Elite has a no-fault attendance policy, and it is contained within the Regional Elite Employee Handbook, which is available to all employees on Regional Elite's employee intranet. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. Coger was familiar with the policy. Coger Dep.114-16, Exs. 14-15.

Under this policy, employees are issued occurrences for unexcused attendance infractions and may have up to (9) occurrences in a rolling twelve-month period. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. There is no grace period for clocking in late for a shift. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. The first two tardies of 59 minutes or less trigger half (.5) an occurrence. After two tardies, any further instances of lateness up to 119 minutes result in one (1) occurrence. Tardies over 120 minutes result in two (2) occurrences. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. An unauthorized absence results in one (1) occurrence. If an employee is absent for two consecutive days and provides appropriate documentation (i.e. physician statement), the absence will count as one (1) occurrence. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. Employees are required to report absences at least one hour prior to the scheduled start time. Employees who call in absences less than 60 minutes prior to the scheduled

2

start time will be assigned a second occurrence. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. Some absences, like absences due to an on the job injury (OJI), are considered an authorized absence and do not count as an occurrence. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. 14. An employee first incurs discipline (a verbal warning) under the attendance policy when the employee receives four (4) occurrences in a rolling twelve-month period. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. An employee who incurs six (6) occurrences in a twelve-month rolling period is issued a written warning under the policy. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. When an employee reaches eight (8) occurrences in a twelve-month rolling period, a final written warning is issued under the policy. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. Final warnings remain in effect for 90 days, and occurrences are not dropped from an employee's file during that period. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47. Employees are terminated when they reach nine (9) occurrences in a twelve-month rolling period or when they incur an additional occurrence during the 90-day final warning period. Coger Dep. 115-17, Ex. 15; Senters Dep. 46-47.

When Senters became the Station Manager at TRI in 2010 she realized that employees' attendance records at the station had not been tracked consistently or in some instances at all. Senters Dep. 45-48. Senters and her Regional Manager decided that TRI employees would all be retrained on Regional Elite's attendance policy and that their attendance records would all be brought to zero occurrences. Senters Dep. 45-48. All employees at the TRI station were required to sign an agreement memorializing that they understood the attendance policy and that their attendance records would be reset to zero. Coger Dep. 118-19, Ex. 16; Senters Dep. 47-48. The agreement indicated that "from [May 30, 2010] forward your occurrences will count

3

against your attendance records." Coger Dep. 118-19, Ex. 16; Senters Dep. 47-48. On June 6, 2010, Coger signed the TRI attendance agreement. Coger Dep. 118- 19, Ex. 16; Senters Dep. 48.

At some point in 2010, the United Steelworkers Union ("Union") began discussing possible representation with Regional Elite's agents at TRI. Coger Dep. 123-24, 131. Following a meeting which all available employees were required to attend in May, Senters said that people who were interested in union information may stay, and those who did not want union information could leave. Coger Dep. 138, 147-148. Senters testified that she explained to the employees that the Steelworkers wanted to organize them and handed out information from Regional Elite regarding the organizing campaign. Senters Dep. 64-65.

Coger wanted the Union to represent her, Coger Dep. 123-24, 131, and she began supporting the Union in May 2010. Coger Dep. 135-36. Coger considered herself the mouthpiece for the Union at the Tri-Cities Airport. Coger Depo. 139-140. Coger communicated with all Regional Elite employees at the facility regarding the Union. Coger Depo. 140-141. Coger was actively and openly involved in soliciting individuals to support the Union organizing efforts at the facility. Coger Dep. 138-139. Coger also met some employees and Union representatives at Carrabba's one night in May 2010 to discuss the Union. Coger Dep. 135-37, 139-40. Coger and one other Regional Elite employee, Stan Byrd, solicited employees to sign cards supporting the Union. Coger Depo. 139. All but four of the Regional Elite employees at the facility signed "cards" which expressed their desire to have Union representation. Coger Depo. 137. Coger solicited and gathered cards as late as September. Coger Depo. 139. Coger planned to attend a Union meeting in Minneapolis in early October. She publicly posted a notice requesting shift trades for the dates of the meeting. Coger Depo. 137. However, she did not tell Regional Elite that she was going to a Union meeting in October. Coger Dep. 138.

4

Coger testified that management told her only to "let them know immediately" if employees were approached by the Union. Coger Dep. 127-28. Regional Elite employees were instructed to inform management if they were contacted by the Union.[1] Coger Depo. 127. Coger gave Senters the business card of the Union organizer that contacted her at the beginning of the organizing campaign. Coger Depo. 126.

Coger believes that Senters was the only one who knew she supported the Union. Coger Dep. 151-54. Coger believes Senters knew about her support of the Union as early as May 2010. Coger Dep. 147-48, 183-84. Coger believes Senters knew of her support for the Union for several reasons because (1) in May 2010 Senters told employees in a meeting they should stay if they wanted to hear information about the Union and Coger remained in the meeting; (2) Coger scheduled a shift trade so that she could attend a Union meeting in Minneapolis; and (3) Coger would talk about the Union 10-15 feet outside of Senters's office. Coger Dep. 138, 156, 183. Coger is only speculating that Senters heard or saw her talking to colleagues about the Union because it occurred outside her office. Coger Dep. 156. Senters testified that she only heard "gossip" about which station employees might be "for" the Union. Senters Dep. 67. In addition, Senters told Coger that a union "would limit her ability to do things." Coger 150-151. Senters also testified that she shared her feelings regarding her personal involvement in a union when she worked at Kroger. Senters Dep 76-77.

Coger admitted that no one was "openly hostile" to her for her support of the Union. Coger Dep. 155. No one in Regional Elite management ever confronted Coger regarding her support for the Union. Coger Dep. 154. Again, Coger discussed the Union with Senters on

---

[1] Coger claims that Regional Elite informed its employees that the Company would fold if the Union was voted in. Coger Depo. p. 140; 145-146. Coger testified that she does not have the document, and she has been unable to produce it through any other means. Coger Dep. 144-47. The defendant has raised admissibility issues regarding this testimony.

only two occasions. Coger Dep. 152-53. In the first conversation, Coger claims that Senters told her if the Union was voted in "it would limit her ability to what she can and cannot do" at the station. Coger Dep. 150-51. Coger believed Senters's comment meant that Senters would not have as much discretion under a union contract and that she would have to follow a collective bargaining agreement. Coger Dep. 151. In the second conversation, Coger claims that Senters told agents during a station meeting "those of you who are not interested in Union information can go and those of you that are may stay." Coger Dep. 147-49. Coger did not leave the station meeting after Senters made this announcement. Coger Dep. 147-49.

On June 3, 2010 Coger received half (.5) an occurrence for arriving to work four (4) minutes late. Coger Dep. 168-69, Ex. 25. On July 11, 2010 Coger received another half (.5) an occurrence for again being late to work by four (4) minutes. Coger Dep. 168-69, Ex. 25. On July 20, 2010 Coger received one (1) occurrence for being late to work by 57 minutes. Coger Dep. 168-69, Ex. 25. On July 21, 2010 Coger received one (1) occurrence for being late by 32 minutes. Coger Dep. 168-69, Ex. 25. On July 26 and 27, 2010 Coger received two (2) occurrences for being absent two days without a doctor's note. Coger Dep. 168-69, Ex. 25. On July 28, 2010, the day she returned to work, Coger received a verbal warning for accumulating her fourth and fifth occurrences on July 26 and July 27, 2010. Coger Dep. 168- 69, Ex. 25. Coger acknowledged receiving the verbal warning that same day, July 28, 2010. Coger Dep. 168-69, Ex. 25. Coger acknowledges she was absent or tardy on these days. Coger Dep. 168-69. Coger took issue with the fact that it took Senters over a month and a half to first counsel her regarding the attendance policy. Coger Dep. 169-70. Coger understood that she was not required to be counseled under the attendance policy until her fourth occurrence. Coger Dep. 169-70. On August 16, 2010 Coger received a written warning for her sixth occurrence (on August 11, 2010)

6

when she was 18 minutes late to work. Coger Dep. 170-71, Ex. 26. Coger does not dispute her tardiness on August 11, 2010. Coger Dep. 170-71. On August 16, 2010 Coger incurred her seventh and eighth occurrences for reporting to work two hours and sixteen minutes late. Coger Dep. 172-75, Ex. 27. Coger was issued a final written warning for her attendance on August 17, 2010 in accordance with the policy. Coger Dep. 172-75, Ex. 27. Coger acknowledges that she was tardy on August 16, 2010. Coger Dep. 172-75. 60. Coger thought it was "crap" that she received two occurrences for arriving to work over two hours late since, had she known she would, Coger would have just taken the whole day off and incurred only one occurrence. Coger Dep. 173-75. On September 21, 2010 Coger was late to work by 27 minutes. Coger Dep. 175-77, Ex. 28.

Senters did not make the decision to terminate Coger's employment; she merely recommended it to her Regional Manager, J.W. Jones, who in turn approved it and forwarded it to Regional Elite's People Department for approval. Senters Dep. 105-06. The recommendation to terminate Coger's employment was reviewed and approved by Regional Elite People Generalist Cory Knutson. Wright Dep. 21-22, 37-39, 47-48, Ex. 2 at Coger 001, 006-007. Knutson approved the recommendation to discharge Coger and then forwarded it to People Manager Carrie Wright for her review. Wright Dep. 21-22, 37-39, 47-48, Ex. 2 at Coger001, 006-007. Both Knutson and Wright reviewed all of the documents supporting the request and confirmed Coger's attendance record and the station's adherence to the attendance policy. Wright Dep. 21-22, 37-39, 47-48, Ex. 2 at Coger 001, 006-007. Wright approved Coger's termination and only then was Coger's employment actually terminated (on September 27, 2010). Coger Dep. 175-77, Ex. 28; Wright Dep. 60. Coger refused to sign the termination document and told Senters that she would hear from her attorney. Coger Dep. 175-77. Regional Elite has an appeal

7

process where employees can ask management to review their termination, but Coger did not utilize it. Coger Dep. 90; Wright Dep. 22-23.

Coger testified about Senters treating only two employees more favorably: Tyler Sanders and Tim Miller. Coger Dep. 186-89. She believed that Sanders had been treated more favorably under the attendance policy, and that Miller had been treated more favorably under the shift trade policy. But Coger testified that she did not know how many attendance occurrences Sanders received, and that she had not seen his personnel file. Coger Dep. 186-89. Moreover, Sanders admitted that he was issued occurrences for his absences and tardiness. Sanders Dep. 26-29, Ex. 6 (SUMF, 72-73). Coger also knew of only one incident where Miller was allowed to trade shifts. Coger Dep. 189-89. Any special treatment Miller received was likely due to Senters's and Miller's personal relationship. Coger Dep. 188-89. Coger believes "if that had been me or, you know, someone else, that probably wouldn't have flew." Coger Dep. 188-89. Coger was never disciplined for not following the shift-trade policy. Coger Dep. 120-21. Furthermore, TRI agent Stan Byrd stated he was not treated any differently for advocating for the Union. Byrd Decl. ¶¶ 3-5.

Coger is not aware of the occurrence infraction status of any of her co-workers. Coger Dep. 186-89. On October 17, 2010 Sanders was placed on a final written warning for attendance. Sanders Dep. 26-29, Ex. 6. The only time that Sanders missed work and was not issued an occurrence was when he missed scheduled days of work due to an on-the-job injury (an authorized absence) between September 13 and October 13, 2010. Sanders Dep. 26-29, Ex. 6. Coger is not aware of any agent who received nine occurrences under Regional Elite policy and was not discharged for it. Coger Dep. 186-89. Senters also discharged TRI agents Connie Obriant and David Williamson for violating Regional Elite's attendance policy. Senters Dep.

8

49. Senters issued numerous warnings to other agents for reaching more than four (4) occurrences in a rolling twelve month period. Senters Dep. 50.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Id.* at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000). This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving

party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established by evidence that is "merely colorable," or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

## III. ANALYSIS

First, the plaintiff alleges that she was terminated in violation of Section 2, Third and Section 2, Fourth of the RLA. These claims are often referred to as "union animus" claims. To establish a union animus claim, the plaintiff must show that (1) she engaged in protected activity; (2) the company was aware of such activity; (3) the company harbored animus toward the activity; and (4) the animus was a causal factor in the termination. *See Int'l Bhd. of Teamsters v. UPS Co.*, 447 F.3d 491 (6th Cir. 2006); *Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 666 (7th Cir. 1996) (stating the elements of a prima facie case for discrimination pursuant to RLA).

Here, the defendant conceded, for the purposes of the summary judgment motion, that the first element is satisfied, i.e. that the plaintiff engaged in a protected activity. The second element is whether the defendant was aware of such activity. There exists direct and circumstantial evidence that Senters knew about the plaintiff's union activity. Senters directly spoke with the plaintiff regarding the Union. Specifically, Senters told Coger that a union "would limit her ability to do things." Coger 150-151. Senters also testified that she shared her

10

feelings regarding her personal involvement in a union when she worked at Kroger. Senters Dep 76-77. In addition, Coger gave Senters the business card of the Union organizer that contacted her at the beginning of the organizing campaign. Coger Depo. 126.

Moreover, there is circumstantial evidence that Senters knew of the plaintiff's support for the Union because in May 2010 Senters told employees in a meeting they should stay if they wanted to hear information about the Union and Coger remained in the meeting. Also, Coger scheduled a shift-trade so that she could attend a Union meeting in Minneapolis although there is some dispute over whether Senters knew of the reason for the change. Coger would talk about the Union 10-15 feet outside of Senters's office. Coger Dep. 138, 156, 183. Finally, Senters testified that she only heard "gossip" about which station employees might be "for" the Union. Senters Dep. 67. All of this evidence is sufficient to withstand summary judgment on this second element.

As to the third element, whether the company harbored animus toward the union activity, there is no direct evidence of open hostility. However, there is a genuine issue of fact as to this factor based on circumstantial evidence. When taking the facts in the light most favorable to the plaintiff, there is evidence in the record that the defendant instructed employees not to talk to Union representatives and to inform management if a Union representative attempted to contact them. Also, after an apparently required company meeting, employees who were interested in the Union were told they could stay to receive information. Although there is nothing overtly discriminatory about this action, a jury could reasonable conclude that this was an attempt by the defendant to identify union supporters or a way to pressure the interested employees not to attend because they would clearly be identified. Senters also told the plaintiff that if the Union were to organize, then it "would limit her ability to do things." The defendant did not begin strictly

11

enforcing the attendance policy until near the same time as the union organization efforts. Finally, the plaintiff was discharged for repeatedly violating the attendance policy shortly after she had co-workers sign cards demonstrating their support for the Union.[2]

The last factor is whether the animus was a causal factor in the termination. Again, considering the facts in the light most favorable to the plaintiff, a reasonable trier of fact could infer such causation. Much of the evidence which supports the third factor likewise supports this fourth factor. The possible attempts by the defendant to identify the Union supporters is circumstantial evidence of support. The fact that the attendance policy was not strictly enforced until the union organizing efforts is further circumstantial evidence. Because this was the conduct for which the plaintiff was terminated and because the termination was temporally proximate to her efforts in soliciting co-workers to sign Union support cards, a reasonable trier of fact could infer causation. For all of the reasons set forth above, there is a genuine issue of material fact as to whether the plaintiff has a prima facie case as to her union animus claims. As such, summary judgment in that regard is DENIED.

Second, this Court must address whether the *Wright Line* test applied in National Labor Relations Act ("NLRA") cases applies in RLA cases. *See Wright Line, a Div. Of Wright Line, Inc.*, 251 N.L.R.B. 1083 (N.L.R.B. 1980); *see also Director v. Greenwich Collieries*, 512 U.S. 267, 276-78 (1994) (discussing *Wright Line*); *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 395 (1983). Other courts have employed this burden-shifting framework in RLA cases. *See Amarsingh v. JetBlue Airways Corp.*, 409 Fed. Appx. 459 (2nd Cir. 2011); *Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 666 (7th Cir. 1996); *Roscello v. Southwest Airlines Co.*, 726 F.2d 217, 222-23 (5th Cir. 1984); *Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc.*, 863 F.2d 891, 893

---

[2] There is enough circumstantial evidence contained in the record that this Court need not address the plaintiff's claim that the defendant distributed a memorandum indicating that the Company would fold if employees organized.

12

(D.C. Cir. 1988); *see also Diaz v. Amerijet Int'l Inc.*, 872 F. Supp. 2d 1365 (S.D. Fla. 2012); *Calloway v. SkyWest Airlines*, 179 LRRM 2750 (D. Utah 2006); *Grosschmidt v. Chautauqua Airlines, Inc.*, No. C85-1432-A, 1986 WL 10077, at *6 (N.D. Ohio April 11, 1986); and *Beckett v. Atlas Air, Inc.*, 968 F. Supp. 814 (E.D.N.Y. 1977). This Court finds the reasoning set forth in those cases persuasive and will utilize the *Wright Line* test in this case.

Third, the Court must now apply the *Wright Line* test. According to *Wright Line*, the employee must prove by a preponderance of the evidence that her protected conduct was a substantial or motivating factor for the discharge. *N.L.R.B. v. G&T Terminal Packaging Co., Inc.*, 246 F.3d 103, 116 (2d Cir. 2001). Once this burden is met, the employer can avoid liability if it demonstrates by a preponderance of the evidence that it would have terminated the employee absent the protected conduct. *Id*.

Although this Court has found that a reasonable trier of fact could infer a prima facie case and even causation from the circumstantial evidence, this Court cannot find that the plaintiff's protected conduct was the motivating factor for the discharge because the evidence shows that the defendant would have terminated her absent the protected conduct. Granted the timing of the discharge is somewhat troubling; however, it is undisputed that the plaintiff clearly violated the no-fault attendance policy. In addition, there is no evidence that any other union supporter, in particular, Stan Byrd, was discriminated against. Furthermore, the evidence shows that the attendance policy was implemented and tracked consistently and fairly. Every employee's attendance record was reset to zero occurrences prior to the "new" strict enforcement. All employees were retrained on the policy and signed documentation indicating their understanding. The plaintiff signed such a document. In sum, the plaintiff can point to no other instance of discrimination and no other incident where another employee, who was not a union supporter,

13

Case 2:11-cv-00077 Document 57 Filed 03/19/13 Page 13 of 14 PageID #: 630

was treated more favorably than herself. There is no genuine issue of material fact on this issue. Accordingly, the defendant's motion for summary judgment is GRANTED.

## IV. CONCLUSION

For the reasons set forth above, the defendant's motion is GRANTED. The case is, therefore, dismissed on the merits.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
